Mr. Chief Justice ShaeKet
delivered the opinion of the court.
The appellants instituted this suit in chancery, for the recovery of the slaves mentioned in the bill, as the heirs of Jacob Cable, their father, who died in 1809, leaving complainants then infants, and their mother, surviving. The most of his property consisted *559 of the slaves mentioned, and his widow, together with one Jesse Cook, administered. Cook took the. negroes into possession, and kept them until his death, or shortly before, which occurred in 1810. During the time he livedj he attended to the business of the estate, the widow paying little or no attention to the administration. In 1810, she intermarried with David H. Bell, one of the defendants, who immediately assumed upon himself the business of administering, and in that capacity, made several settlements with the orphans’ court, and continued to act in that capacity after the death of Mrs. Bell, which happened about a year after the marriage. He kept the negroes in his possession until 1818, when he sold part of them to Martin, the other defendant, at private sale, as his own property. The balance he sold in the same way, to another individual. These are the prominent facts in the case, and out of them, counsel have raised two principal questions: First, have the complainants any right to the negroes mentioned in the bill? and, secondly, if they have a right, have they sought redress in the proper tribunal?
It is in the first place contended, that they are not entitled to the negroes, because the widow of Cable, while she was adminis-tratrix, elected to take them at the appraised value, as her own property, which it is said she had a right to do, and that she thereby acquired a title which vested in Bell by the marriage. If Mrs. Cable could or did acquire any right by this means, it tvould be necessary to fix the act of appropriation, or taking at the appraised value, at a time prior to December, 1809, because at that time, the legislature passed a law prohibiting administrators from taking the property of their intestate at the appraised value. From the fact that such a law was enacted, it is presumable that it had been customary for administrators to take property at the appraised value; but even if such a custom prevailed, it does not follow that it was in conformity with law. It does not become necessary, however, that we should decide on the right of Mrs. Bell so to appropriate the property, since the facts, as disclosed by the testimony, do not establish any such election, anterior to the passage of the statute; on the contrary, the weight of evidence leads us directly to a differ *560 ent conclusion. James H. Watson, the brother of Mrs. Cable, states he heard her say she intended to keep the negroes at the appraised value, but when she made this declaration does not appear with any thing like certainty, nor does he speak of any distinct act of appropriation. Even then if she had so intended, her mere unexecuted intention would avail nothing. No change of property was effected by it. George B. Watson, another brother, who frequently conversed with her, heard nothing of any such intention. Nor did Jeremiah Watson, who was also a brother, and lived in the same family with her, from shortly after the time of Cable’s death, and who seems to have had the best opportunity to become acquainted with her intentions. It is not probable either, that, if such had been her fixed purpose, she would have permitted it .to rest upon such a loose and uncertain foundation. We have, however, evidence of a more conclusive character than even the declaration of the witness. Bell,.in January, 1812, returned to the orphans’ court an inventory of property received by him from the former administrator in which these negroes are included as the property of the estate of Jacob Cable, deceased. It is scarcely probable that he was so ignorant of his rights as to return that as property of the estate which in reality belonged to him individually. Nor is it probable that his wife could have taken this property at the appraised value without some knowledge of it on his part. The first decisive act of appropriation, or taking at the appraised value, is contained in Bell’s administration account, returned to the orphans’ court, in January, 1814, in which he charged himself with the sum of S50 dollars, expressed to be for these negroes, taken at the appraised value. His conduct seems to have been the first of an after thought, by which he attempted to avail himself of a privilege which he supposed his wife had possessed at an early period of her administration. The title derived, therefore, from this source must fail, since the facts show no such thing as an election by the administratrix to take the property at the appraised value, at a time when she had a right to do so, even if it be admitted that such a right she ever had.
Bell sold the negroes claimed in 1818, and it is further urged, *561 that even if he had no other right than that of administrator, his vendee nevertheless acquired a good title, although he committed a devastavit by soiling. The statute already mentioned is conclusive on this branch of the subject. See Turner’s Digest, 448. It prohibits an administrator from selling property in any other manner than at public sale, and prescribes the course to be pursued, if it should become necessary for him to sell the property of his intestate. The statute was designed to protect the interests of distributees, for whom the administrator is but a trustee, having no ultimate right of property; and his conduct must be regulated by the limitations and restrictions imposed by law. His acts are only legal so far as they are justified by law. The ultimate right of property is in the distributees, and there is no way of divesting them of that right, except for such purposes and in such a manner as the law prescribes. The administration bond is intended to indemnify distributees, but their right of action for a breach of the condition does not legalise the act which constitutes the breach. The bond is but collateral security and does not divest the right of distributees to the specific property. That must remain unimpaired, unless taken away by strict compliance with law, and inasmuch as the sale by bill was not in conformity with the statutory provisions, but in direct violation of them, the defendant Martin acquired no title to the property by the purchase. We are thus led to the conclusion that the property is still a part of the estate of Jacob Cable, deceased, and that the complainants are entitled to it as distributees, and this brings us to the second inquiry, whether they have applied to a tribunal competent to give relief.
For the appellants it is insisted, that even if the court had not jurisdiction, the objection should have been taken by plea or demurrer, and comes too late at the hearing on the merits. This question has been settled in New York by a train of adjudicated cases, in which it has been uniformly held to be too late to question the jurisdiction of the court at the hearing on the merits. 2 Johns. Chan. Rep. 369; 4 Johns. Chan. Rep. 290; 10 Johns. Rep. 595; 4 Cowen, 726-7.
As our practice conforms very nearly to the practice in New *562 York, these cases might be considered as good authority, even if none others were to be found; but this rule is not peculiar to New York. The same principle has been also settled in South Carolina, in a case where the point was directly raised. 2 McCord’s Chan. Rep. 134-5. It is a rule founded in reason. Both at law and in equity, a party who comes in and pleads or answers to the merits, is supposed to admit the jurisdiction of the court, and he will not afterwards be heard to deny what he has already admitted. If that were the case, there would be no end to litigation, as the party might change his ground at every new aspect of the case. It is neither reasonable nor just that the objections to the jurisdiction should be taken after a complainant has been at the trouble and expense of a tedious suit, and when he has a right to presume, that such objections, if they ever could have prevailed, have been waived by the opposite party. A case purely legal in its character, in which a court of chancery, from its peculiar organisation could not afford relief, might and probably would form an exception; such for instance as an action for tort sounding purely in damages, or debt on written instrument, when there was no legal impediment'to a recovery at law. But when the legal remedy is doubtful, and equity can give relief, the objection cannot prevail.
But if this objection did not come toó late, I should think it very doubtful whether it could be successfully raised in the present case. The jurisdiction of a court of equity must rest upon the capacity of the parties to sue, or it must be determined in reference to the subject matter of the suit; and it is a rule without an exception, that whenever the remedy is more full and complete in equity than it is at law, courts of equity will exercise jurisdiction. Keeping this principle in view, let us inquire whether it does not apply in the present case. If there is a remedy at law, it cannot be enforced by any other person than an administrator de bonis non, a character which does not belong to these complainants, nor to any other person; and if we turn them out of chancery we can only do so because, by possibility, they may acquire a character in which they would have a remedy at law. But it does' not necessarily follow that they could acquire that *563 ■character. Certainly they could not without complying with the conditions of the law, which they might not be able to do. The ground on which courts of equity usually refuse to exercise jurisdiction is, that there is a subsisting remedy at law, not because by change of circumstances or change of character there may be such remedy. This view would at least present the case in a doubtful aspect, because circuity would be the consequence. But even if by talcing upon them the character of administrators, they would have a remedy at law, yet they could also have a •remedy in equity, because in neither court would it be complete without an account for the profits, and in matters of that kind courts of law and courts of equity have concurrent jurisdiction, although the remedy may be complete in either. 4 Cowen, 726-7.
The extent of the complainants’ right in the property claimed may justly be considered, however, as .entitled to more weight in settling the question of jurisdiction. The complainants claim the property as heirs and distributees of the estate of Jacob Cable, deceased, whose widow was entitled to one-third part of the personal property, not for life only, as was contended in argument, but absolutely. When she married Bell, he thereby acquired title to her.portion. He sold the whole of the negroes, and although' he had no right to dispose of that part or interest which belonged to the children, yet I know of no rule which would prohibit him from selling his individual interest; and if he was capable of making a valid sale of that part¿ his vendee must be protected in equity to the extent of that interest. If this position be tenable, the remedy of complainants cannot be purely legal, as they are only entitled to recover a portion of the property, and a.corresponding portion of the profits, the extent of which can be best ascertained, and the respective portions best allotted by a court of chancery.^ The complainants, however, are not willing to concede to Bell any interest in the property, because, as they contend, he never reduced it to possession during coverture. Even if he had not done so, I should be unwilling to decide that he could have no right; but I think his possession must be regarded as sufficient to complete his title. This branch of the subject was so *564 cursorily touched in argument, as to leave it doubtful what influence counsel supposed it should have in the decision. The testimony warrants the conclusion that Bell was in possession during the coverture, and exercised acts of ownership, which, independent of the character of that possession, would undoubtedly be deemed sufficient; but it is contended that it was a fiduciary possession, and did not sever his property from the estate. There was probably no act of division or partition, but did he lose his right for the want of such partition? He had acquired that right by marriage, and although the identical property to which it attached had not been severed, yet he had it in possession by virtue of the marriage, and having the title and the possession, a court of equity shotdd not defeat that title because the identical property was not set apart by partition. But if it were in reality a fiduciary possession in Bell, I do not think it should be permitted to destroy his own right when it depended upon his individual possession; nor have we been furnished with any authority to show that a fiduciary possession would not be sufficient to complete the husband’s right to the chattels of his wife. It is true we learn from the books that the husband will not be entitled to the choses in action of his wife after her death, unless he has reduced them to possession during coverture; but the mere exercise of acts of ownership is deemed a sufficient possession. It is by no means clear either that this doctrine will apply to personal property, the title to which draws to it the right of possession, whilst a chose in action is more properly a mere right, not attached to any particular thing to the exclusion of others of the same kind; but something incorporeal.', On this distinction, however, it does not become material for us to decide, since the possession of Bell must be considered sufficient to have enabled him to sell; and as there is nothing to show that the purchase was not made in good faith, the vendee is entitled to the benefit of his purchase to the extent of Bell’s interest in the negroes. Here, then, a case is exhibited, in the subject matter of which the complainants .and defendants each have an interest, but the extent of the interest of each is undivided and unascertained, being concentrated in an entire property; and the court is called upon to protect the interest of each *565 party. Certainly the remedy at law would not be as complete as it is in equity, because no remedy could then be had without partition, and after partition a suit would be necessary for the property and the profits. In this particular this case differs from that of Bailey and Wife v. Duncan’s Representatives, 4 Monroe, 256, in which the complainants failed, because their right was merely as distributees, where there was no other interest involved. The court decided that the remedy was with the personal representatives, who were entitled to the possession of the property. Here, although the complainants claim as distributees, they cannot claim the whole of the property, and the holders have a right to an unascertained part. If they were to administer, they could not recover until it was divided.
There was another ground assumed in the argument in favor of the remedy at law, which requires to be noticed, especially as we are told that it was the point on which the case turned in the court below. It was said, that by our statute, personal estate descends in the same way that real estate does, to the heir, and that, therefore, a legal title was cast by descent, which should be pursued in a court of law. The difference in the language of our statute and the English statute of distributions is relied on as furnishing grounds for this position. The English statute merely provides that the personal estate shall be distributed by the administrator after the payment of debts, whilst ours declares that when “any person shall die possessed of any goods and chattels, or personal estate, not bequeathed, the same shall descend to, and be distributed among his or her heirs, in the same way and manner that real estates, not devised, descend by this act.” The word descend is used in our statute, and it is not in the other, but I apprehend that the statute w as- framed more particularly with a view to the course of descents, than to the kind of title it conferred. It declares that personal estate shall descend in the same way and manner that real estate descends. To understand this section, we are obliged to have recourse to that part of the statute which provides the course of descent of real estate; but no person would think of examining it for any other purpose than to see who could inherit, and having ascertained that, the course of distribu *566 tions follows. Descent is a technical term, it is true, signifying the means whereby lands are derived from the ancestor to his heir; but it will not do to adopt it with all its force, and apply it to personal property not bequeathed. The whole structure of our statutory law forbids, and is utterly repugnant to such an application, and we cannot, therefore, suppose that the legislature intended to use it in its strict technical sense. If it is to be so understood, it would deprive the administrator of the possession of personal property, for the heir is entitled to his inheritance immediately on the death of the ancestor; whereas it is clear that the administrator is entitled to the possession of personal property. The condition of his bond alone, would show it. He is thereby required to make an inventory of the goods, chattels and credits, and to administer the same according to law. The law requires him to take care of the property, pay the debts, and render an account, and after the payment of debts, the surplus is to be decreed by the orphans’ court, to those entitled as next of kin. If the term “ descent” was intended to be used in the technical sense, where is the necessity for a 'decree of the orphans’ court of the inheritance to the heir? The administrator is, to all intents and pur-pos’esj a trustee; first, for the creditors, and next, for the distribu-tees, or next of kin; and so it was in. England, after the passage of 22 and 23 Car. 2, c. 10. There, as here, after the payment of debts, he was bound to distribute the surplus under the decree of the ordinary to those entitled. The condition of his bond is very similar to the condition here, and powers and duties nearly, or perhaps entirely the same. He is looked upon and treated as a trustee for creditors and distributees and bound to discharge the trust as an administrator is here. He has the same power over the personal estate, and no more, and I cannot see how the title of a distributee in England and this country can materially differ. It cannot be any better here, because he holds it by the word descend, when that term can have but a limited application; nor am I aware that it is capable of conveying a better title to personal property, than the term distribute. “Déscent” is a term not generally used in reference to personal property, because it is a term of the common law, which was fixed in. its appplica *567 tion to real property, long before personal property was considered of sufficient consequence to merit transmission from ancestor to heir. Nor will it still admit of application to personal property in England, because the law of primogeniture prevails in regard to land, and it does not with personal property. With us, real and personal property descend equally amongst the heirs. Real property does not here descend, according to the strict technical meaning of the term, but it is a statutory descent; and we are to look to the statute law for an explanation.
I do not think any of the grounds taken, present good cause for dismissing the bill for want of jurisdiction. The decree of the chancellor must therefore be reversed, and the cause remanded for a decision on the merits.